Filed 7/1/22  P. v. Bratcher CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>HASSAN LEE BRATCHER,<br><br>　　　Defendant and Appellant. | A159493<br><br>(Alameda County<br>Super. Ct. No. 17-CR-012238)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 14, 2022, be modified as follows:

1.　　On page 3, second full paragraph, delete the sentence beginning "Jane Doe testified that" and footnote 1, and replace them with the following sentence and new footnote 1:

> Jane Doe testified that defendant was clapping his hands.[1]
>
> [1] Jane Doe demonstrated defendant clapping his hands for the jury.  It is not clear from her testimony if defendant carried out one or more of these clapping movements.  When the prosecutor asked her about her prior testimony that defendant clapped his right fist into

his left open palm, Jane confirmed that defendant did that. Defendant denied that he made any of the gestures Jane testified about and said he made a different gesture when she asked him to take her back to the church.

2. On page 22, at the end of the carryover paragraph, after the sentence "Here, Jane Doe, M. Doe, B. Doe, and Whitney Doe were all extensively cross-examined and impeached," add as footnote 10, the following footnote, which will require the renumbering of all subsequent footnotes:

[10] Defendant filed a petition for rehearing asking that we include many additional facts in our opinion to demonstrate the closeness of the case and the prejudice defendant suffered from the failure to give the cautionary instruction. Many of the facts defendant requests were included in the opinion, but defendant seeks the inclusion of additional minor details or exact quotes. Other facts largely pertain to contradictions in the testimony of Jane Doe and other witnesses that we did not include in our otherwise lengthy summary of the testimony at trial. As we explain however, because the jury was thoroughly instructed about how to evaluate witness testimony and the prosecution witnesses were extensively impeached, defendant cannot show the failure to include the cautionary instruction prejudiced him.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated: _____

_____
HUMES, P. J.

Filed 6/14/22  P. v. Bratcher CA1/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HASSAN LEE BRATCHER,<br><br>        Defendant and Appellant. | A159493<br><br>(Alameda County<br>Super. Ct. No. 17-CR-012238) |

A jury convicted defendant of kidnapping and rape.  Defendant contends the trial court committed reversible error by failing to instruct with CALCRIM No. 358 (Evidence of Defendant's Statements), and defense counsel was ineffective for failing to object to wrongly listed convictions and the wrongly calculated Static-99R risk assessment in the probation report. The Attorney General concedes, and we agree, that the court's refusal to give CALCRIM No. 358 was error; however, under the circumstances, we conclude the omission of this instruction was harmless.  We also agree with the Attorney General's concession that this matter must be remanded to the trial court for a hearing to correct the probation report.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Underlying Crimes*

Jane Doe was a 33-year-old woman between seven and eight months pregnant, who had significant intellectual and learning disabilities.  On March 5, 2017, she left a transitional housing shelter in Oakland where she lived to take a transit bus to Love Temple Missionary Baptist Church located on 85th Avenue and Birch Street in Oakland.  The church has a parking lot located in the rear.  Jane Doe is a member of the church who attended sporadically, but was known by a male deacon and a female member.

At 8:25 a.m. that day, Jane Doe exited the bus and walked across 85th Avenue.  Because she was pregnant, she was feeling tired and her feet were swollen.  As she was walking down the sidewalk on 85th Avenue near the church, defendant drove up in a white van with tinted windows.  Through an open window, defendant said to Jane Doe, " 'You know me.' "  Jane Doe had never seen him before, and feeling "[k]ind of scared," she responded, " 'I don't know you.' "  Because Jane Doe was "so tired," she asked defendant for a ride to the church.  After defendant agreed to give her a ride, she got into the van, sitting in the right front passenger seat, and defendant gave her a ride to the church.

Defendant parked in the church's empty parking lot near the back door of the church.  He did not threaten Jane Doe.  After being informed by a church member that a vehicle was parked "up to" the back door, a church deacon opened the door, approached the van, and spoke with defendant through his open driver's side window, asking him what he was "doing there at that time in the morning."  In response, defendant asked the deacon, " 'Is this a church?,' " after which he added, " 'I'm sitting here chilling.' "

2

Defendant appeared to be under the influence and had "a lot of white powder around his beard." The deacon told defendant he could not " 'sit here and chill.' " The passenger's seat, according to the deacon, was reclined, and the passenger "waved" but did not speak. Following his encounter with defendant, the deacon walked back into the church to his desk to finish "doing his business."

Defendant drove to the side of the church and parked his van. He started throwing money on the passenger seat where Jane Doe was sitting. Jane Doe was "mad" and told defendant she was not a "hoe" (*sic*) at which point, he took his money back, stating, " 'I know what pregnant pussy taste like [*sic*]' " or " 'I know something about pregnant pussy.' " She attempted to exit the passenger's side of the van, but defendant locked the door. Jane Doe testified that defendant clapped his hands in front of her stomach, clapped his hands in front of her face, and "clapped" his right fist into his "left open palm."[1] She asked defendant if she was a "hostage." He said, " 'Yes.' " She felt "afraid."

Defendant drove away from the side of the church to a "dead-end by the old man's house." He subsequently pulled his vehicle into the driveway of a house located at the end of a dead-end street at the corner of 105th Avenue and Breed Avenue, and parked up against the garage door. Jane Doe did not want to go to this house. While situated in the van in the driveway, defendant removed Jane Doe's clothing and wearing just a T-shirt, he inserted his penis inside her vagina. Jane Doe felt mad and sad. She was afraid, but claimed she could not attempt to escape because she could not "walk that fast."

---

[1] It is not clear from Jane Doe's testimony if defendant carried out one or more of these clapping movements.

3

Defendant eventually stopped having sex with Jane Doe, and pulled out of the driveway, driving to a different location in front of a home, which was near Beverly Avenue and Broadmoor Boulevard in the City of San Leandro. Jane Doe identified a photo of this location because she recognized the trees and houses. She did not want to go there. When they arrived at this location, Jane Doe was not wearing the clothing defendant previously removed. They had "sex again" in the van. Defendant put lotion on his penis and, without using a condom used his penis to penetrate her vagina. She told defendant "no" about three times. At some point, while at this location, Jane Doe asked defendant four times to take her to the church. He replied, " 'No.' "

Thereafter, Jane Doe told defendant she needed to use the bathroom, and he drove her to another location which "had stairs." Jane Doe did not know she was going there, had never been there before, and did not want to go there. After defendant parked the van, defendant "had to come help [Jane Doe] out of the car." He held her shoulder with one hand to prevent her from going anywhere. She felt "Afraid." When Jane Doe got out of the van, she did not have her shoes, socks, pants or underpants on, but she was wearing a long dress. Jane Doe used the bathroom near the stairs to urinate. While she was urinating, Jane Doe heard somebody come down the stairway. Defendant told her to " 'Get back in the van,' " and she complied.

At one point, while driving around in the van, defendant parked in front of an orange house. Not only had Jane Doe never been there, but she did not want to go there. Because she was "very scared," she cried, but nothing else happened at the orange house.

Ultimately, defendant stopped at a park next to Webster Academy in Oakland and told Jane Doe to, "get out, bitch." Jane Doe walked to a Walgreens on International Boulevard. There, she used her cellphone to call

4

her sister, T.M., twice. During the first call, Jane Doe, who was crying, told her sister something had happened to her, causing her to miss church. And during the second call, Jane Doe stated a man had forced her into a vehicle and raped her.

Following the second phone call, T.M. called the police, and in the meantime, Jane Doe called her brother to come and pick her up. Jane Doe's brother picked her up and drove her to the transitional shelter where she had been living. When she arrived at the shelter, her mother, sister, and stepfather were there. In response to her sister's phone call, both the police and an ambulance arrived at the shelter.

Jane Doe was transported by ambulance to Highland Hospital where she received a sexual assault examination performed by a physician's assistant. Testifying as a sexual examination expert, the physician's assistant indicated that during the examination, he observed redness, swelling, and tenderness on Jane Doe's labia and in the "structures at the base, opening of the vagina," and "a 2 millimeter linear tear with small red blood at the base of the linear abrasion." These injuries, according to the physician's assistant, were significant and "[m]ore often than not, [he does] not see injuries this severe in sexual assault cases." The sexual assault examination also included the swabbing of Jane Doe's anus and vagina for DNA samples. Defendant's DNA was later found on the anal swab; however, the DNA was not from sperm, but it could have been from skin or saliva.

That evening at 9:30 p.m., Jane Doe called A.M., an independent contractor who worked with Jane Doe through the Regional Center of the East Bay. Jane Doe told A.M. that she had been raped and had gone to the doctor.

5

### B. Uncharged Sex Crimes

Pursuant to Evidence Code section 1108,[2] the trial court allowed evidence of three uncharged sex offenses to demonstrate defendant had a propensity to commit sexual offenses against women.

#### 1. Whitney Doe

Whitney Doe testified that around noon on March 19, 2017, she took her dogs to a dog park, located near her residence in Oakland. She was alone and did not have her cell phone. As Whitney walked through the pedestrian gate of her complex to the dog park, she observed a white "socker mom van [*sic*] with little stick people, family sticker on the back" parked up against another gate, the "drive through gate." This vehicle had tinted back windows and was "unusual for [the] area" because there were a few families living in the building, but they did not drive "cars like that." The van was also blocking other vehicles from entering or exiting. When Whitney walked by the passenger's side of the vehicle, she saw an unfamiliar man, defendant, in the driver's seat staring at her "super hard." She felt "[e]xtremely uncomfortable" but continued on to the park.

Once Whitney entered the dog park, she let her dog off its leash and turned back around so she did not have her back to the vehicle. As Whitney's friend, Sarah, came through the pedestrian gate to walk her dog, defendant began staring at her. When Sarah indicated she did not know defendant, Whitney asked her to take a cell phone picture of the van. After Sarah took a picture, defendant made a U-turn and parked "nose to nose with a parked

---

[2] Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

6

car," blocking Sarah outside the dog park. Whitney pulled Sarah inside the dog park, took ahold of her pit-mix dog, shut the park's gate, and told defendant he needed to "back up and back off of [them]." In response, defendant started saying "really uncomfortable disgusting terrible things."

Whitney asked defendant to leave at least three times and, walking closer to the car, took photographs with her friend's phone. While she was taking pictures, defendant made lewd comments and faces. He rolled down the driver's side window at which point, Whitney saw defendant's penis, drugs, empty bottles, and "a passed out mostly naked female" in the passenger seat. Defendant told Whitney he wanted to "fuck [her]" and "fuck whitey." He continuously pulled on his penis while Whitney was taking pictures. As Whitney stepped back from the van, the driver's side sliding door opened, and defendant asked her to get in the vehicle. She refused and called the police. At no time did defendant cover his genitals or turn his body away from Whitney. She felt afraid for herself and the woman inside the van.

The parties stipulated that defendant was acquitted of a violation of Penal Code section 314, indecent exposure, in connection with this incident.

### 2. *M. Doe*

M. Doe, who was in custody for an unresolved misdemeanor theft case, testified she first met defendant, a good friend, eight years earlier in east Oakland. She saw him once or twice a month. They drank, smoked weed, did cocaine, and partied together.

In December 2014, while M. was walking on International Boulevard, defendant pulled up in a Mercedes, stopping to talk with her. After asking defendant if he could get her cocaine, M. climbed into his car. Defendant bought some cocaine, and they went to his house. At defendant's residence,

7

defendant and M. drank vodka, smoked and snorted cocaine, watched porn, and had oral and vaginal sex.  Defendant had not ejaculated, and when M. was getting ready to leave at 4:00 a.m., "things turned south."

Defendant indicated he could find some more cocaine since he had run out.  He tried calling a friend who did not answer the phone.  When M. stated once more that she was leaving, defendant snatched the wig off her head, and said, " 'Bitch, you're not going nowhere.  Get back in the room.' "  Defendant then grabbed M. and threw her back into his bedroom.  She was shocked and surprised.  Then he made her take off her clothes, stating in a "forceful tone," " 'Take that shit back off.' "  Defendant threatened to punch M. in the face, while putting his right fist in the palm of his left hand.  She was scared and did not believe defendant was joking.  Defendant "pushed" M. onto the bed and continued to try to have sex with her.  While M. was lying on her stomach, he folded his arms around her neck and bit her back, preventing her from extricating herself.  He inserted his penis inside her vagina for a long time without her consent as he watched "porn," drank alcohol, and smoked weed.  Defendant also grabbed M.'s head, forcing her to give him oral sex.

Eventually, defendant ceased assaulting M.  As defendant was walking around the room on his cell phone, M. ran through the kitchen to the back door but was prevented from getting outside by the top lock of the screen door.  Defendant "socked" M., causing her to pass out.  He then grabbed M.'s leg, dragged her away from the screen door, and bit her leg.

While M. was in defendant's residence, she yelled for help, and at some point, the police arrived, announced their presence, and defendant allowed M. to leave through the back door.

Subsequently, during the trial in the present matter, as M. was being transported back to the jail, she saw defendant in an elevator.  While she was

standing at the door of the elevator, M. said to defendant, "Oh my god. What happened, Hassan? You did it again?" And defendant replied in "so many words," " 'Yeah.' " After M. told defendant she was " 'supposed to go [to] court next week,' " defendant stated, "he knows," and told M. "to come here and say I don't remember anything. And he'll pay me to say that." M. did not agree.

### 3. B. Doe

B. Doe, who was 66 years old at the time of trial, testified about an incident that occurred on December 27, 2014. At that time, B. was a prostitute. She smoked crack and drank alcohol.[3] That day, in the early morning, while walking to a store on or near San Pablo Avenue, B. saw defendant in a car. She entered defendant's car with the purpose of just sitting, drinking, and talking for "a minute or so." B. knew defendant through "other ladies. But that was it." They drove to defendant's apartment.

While driving to the apartment, defendant tried to solicit B. for prostitution but "it didn't happen" because defendant did not "bother [her] in that way." Upon arriving at defendant's apartment, they sat down and talked, and B. drank wine from a bottle she brought with her. She used her phone to ask a friend to pick her up. As she was getting ready to leave, defendant grabbed her phone, talked to her friend, called her a " 'Bitch,' " and told her not to call back. After B.'s friend called back, defendant took the battery out of the phone and threw the battery and the cell phone. B. was "scared to death." When B. told defendant she was going to leave, he responded she was not going anywhere, and hit her in the mouth, causing her

_____

[3] B. testified that she had since turned her life "over to God" and "now I am not doing those things." She was in church and not on the streets anymore.

9

lip to bleed.  Defendant gave her paper towels to stop the bleeding.  When defendant turned his back, she ran out of a sliding glass door to the balcony, with the thought of jumping off the balcony, but defendant pulled her back inside.  She screamed "to the top of [her] lungs" for help and unsuccessfully tried to escape.  B. tripped on the floor and landed "flat on the floor, on [her] back."  Defendant got on top of her and put his thumbs on each side of her neck, applied pressure, and stated, " 'I told you to be quiet.  Don't make no noise.' "  B. could not breathe.  Defendant told her to take her pants off and she complied because she was scared and wanted to "get out of there."  During the assault, B. saw defendant's penis, but it was not erect and he did not touch her sexually.  She did not want to see it.

When Oakland police officers eventually arrived and knocked on defendant's door, defendant told B. to " 'Be quiet.' "  They knocked again, "maybe three times before [defendant] said, 'Just a minute.' "  After the police stated, " 'Open the door,' " B. crawled on the floor from the living room to the door, but defendant put a bar chair against the door.  B. warned the police that defendant had put a barstool under the doorknob.  The door was finally opened, and she told the police what happened.  Officer Kathryn Reymundo observed that B.'s lip was swollen, she was bleeding from her mouth, and there was fresh blood on the floor.  The officer noted defendant was completely nude and did not have any injuries.

The parties stipulated defendant was acquitted of a violation of Penal Code section 220, subdivision (a)(1), assault with intent to commit rape, in connection with this incident.

10

## C. *Defendant's Testimony*

### 1. *Jane Doe Incident*

Defendant testified that on the morning of March 5, 2017, while he was in his white van, he observed Jane Doe on 85th Avenue and Birch Street near the church parking lot. He was wearing an ankle monitor. Defendant thought he may have seen Jane Doe before but had never spoken to her. Defendant "dipped" next to Jane Doe, and they both said, " 'What's up.' " She asked to get into his van. Defendant did not threaten or try to intimidate her into entering the van. Because defendant believed there were "a lot of prostitutes and drugs and everything" in that neighborhood and thought Jane Doe might be a prostitute, he allowed her to climb into the van to "have sex." At first, defendant did not notice she was pregnant as she had a big jacket on and was "covering with her purse." After Jane Doe gestured toward the church parking lot, defendant drove there. He thought she was directing him to a "spot [where] we could do it at."

Before encountering Jane Doe, defendant had recently purchased cocaine and began breaking it down in the parking lot. He then "jumped out real quick," retrieved a bottle of alcohol from the vehicle's trunk, put alcohol inside a water bottle, wrapped the bottle in a jacket, and put the alcohol back in the trunk.

As defendant was "sniffing powder," the church deacon came outside, approached the driver's side of the vehicle. The driver's side window was open. The deacon wanted to know what defendant was doing, told him he could not " 'be right here,' " and could not come into the church yet, because regular church services did not start until 11:00 or 11:30. According to defendant, the deacon could tell he had cocaine on his beard. In the meantime, Jane Doe put her seat back, slouched down, and when the deacon

11

looked in her direction, she raised her hand to her face turning to the right, as if she was trying to hide from him.

Defendant put his seat belt on because he was under the influence, drinking, and already on parole. He then drove to the side of the church on Birch Street and parked. There, he sniffed cocaine, drank, and listened to music. At this point, according to defendant, Jane Doe stated, " 'How much you got?' " Defendant replied he had about $30 for her, to which she responded, " 'I ain't no cheap hoe [*sic*].' " He then handed Jane Doe $50, which she accepted.[4]

Defendant claimed he drove, at Jane Doe's direction, to Olive Street near 96th or 95th Avenue. She hopped out of defendant's vehicle and went to an apartment complex and obtained some powder that made her hallucinate. Following their stop at Olive Street, they drove to 100th Avenue and Birch Street where defendant sniffed powder and Jane Doe was "doing her thing."

Next, they traveled to a dead-end street at 105th Avenue, where defendant parked at a garage. He jumped out of the car "to use the bathroom." Jane Doe also got out of the car on the passenger's side because she thought defendant was going to take her into one of the houses. Defendant urinated, got back in the van, at which point, an elderly man came out of his house, and said they better leave or he would call the police. They were both still dressed.

From there, defendant drove Jane Doe to a driveway on 108th Avenue, where they had sex while standing outside the van. This was the first time defendant realized she was pregnant. Defendant used a condom and lotion.

---

[4] Defendant's testimony is somewhat confusing, because later during cross-examination, he testified he threw money on her seat, at first $30, and then after Jane Doe said she was not a " 'cheap hoe [*sic*],' " he threw an additional $20 on her seat.

According to defendant, he only had sex with Jane Doe once, presumably at 108th Avenue. Because a car drove by and somebody was walking by, defendant stopped and got into the front seat of the van and drove away.

Defendant thought Jane Doe wanted "to go pee" because "the lotion was burning her vagina." They went to some "apartment complexes" where she urinated by the stairs. As Jane Doe was wiping herself with some paper towels given to her by defendant, some people came down the stairs.

Defendant and Jane Doe left and drove about two blocks away to Beverly Street. Once they reached this location, defendant testified he was "fishing up the last of the cocaine [he] had," and Jane Doe "was doing her thing with her drugs." Then "she started tripping" and believed his phone was turning red. Jane Doe stated defendant needed to take her back to the church, but defendant was feeling a little sick and asked her to " '[h]old on for a minute.' " She "kept nagging" him to take her back, and ultimately he dropped her off near the church.

Defendant denied forcing Jane Doe to go anywhere she did not want to go, or forcing her to do anything sexual, or threatening or hitting her. "Everything was consensual."

Defendant acknowledged Jane Doe had a speech impediment when she testified, making it difficult to understand her; however, he claimed she spoke more clearly when he met her, although she may have occasionally stuttered.

### 2. Other Offenses

#### a. Whitney Doe

As to Whitney Doe, defendant testified he was in his van with a woman who was giving him oral sex when Whitney approached the vehicle, became "nosy," and looked inside. Defendant moved the van. He insisted he did not

13

try to get Whitney's attention, flag her down, call her over to the van, or attempt to show her his "private parts." Rather, he claimed Whitney approached his vehicle with a pit bull and told him, " 'Get the fuck out of here.' " While she was there, he was not masturbating, nor was his penis erect, but he had cocaine in his hands. The woman in the van said to Whitney, " 'You act like you want to get in or something.' " Defendant denied saying he wanted to "fuck whitey." Instead, he stated, " 'She want to hit the white girl,' " referring to the cocaine. He did not know Whitney was taking pictures until the "last few." When the police arrived, defendant admitted he did not obey their commands and tried to "get around them" because he was in possession of cocaine.

### b.   M. Doe

Defendant testified about his contact with M. Doe. He had known her for about a year prior to the incident, and they had been to each other's residence on several occasions. Defendant met M. on the "track on International" and had a paid sexual relationship with her. Usually, they got high, drank, and had sex.

Defendant testified that on December 13, 2014, he met M. on 62nd Avenue and International Boulevard. He told her he wanted to reach an understanding before paying her with his money and drugs. She instructed him to obtain drugs for her so she could experience a high first. In exchange for money and drugs, she would " 'do how we usually do.' " Prior to going to defendant's residence, defendant gave M. $50 for her to purchase $30 of crack with the understanding that she would keep the $20 balance.

Once they arrived at his residence, they drank vodka, M. got undressed, and smoked crack in the bathroom. They both used powder cocaine. However, defendant became involved in an altercation with M. in

14

his bedroom because he paid her to have sex, but she "kept stalling," eventually informing him, " 'I ain't giving you shit.  I ain't giving you nothing.' "  When M. refused to give the money back to defendant, they argued.  After defendant went to the bathroom, M. tried to run out the back door and started screaming and yelling when she was unable to open the gate.  Reacting to her screaming, defendant said, " 'Bitch, what are you doing?' "  They got into a "tussle, scuffle," pushing each other, and ended up on the ground wrestling.  Defendant "probably" choked, bear hugged, and bit M.  When the police arrived, he thought he "probably let her out" through the back door.  Defendant could not remember whether he had sex with M., but did not think so.  He maintained he never forced or threatened M. to have sex with him.

While defendant acknowledged speaking briefly with M. when he was inside the elevator and she was outside, he denied offering her money to testify she had forgotten about what happened between them.  M. just inquired, " 'What happened?' " and he told her this was the same case as the last trial which had been reversed.

### c.    B. Doe

With respect to B. Doe, defendant testified he did not know her prior to the incident on December 27, 2014; however, he claimed she knew about him from "[her] girlfriends."  On that day, defendant saw B. on San Pablo Avenue, one of the prostitution "tracks."  As he was driving his BMW, B. flagged him down, which defendant interpreted to mean she wanted to have a sexual "date."  B. entered his vehicle and agreed "she would like to date."  When she asked him for alcohol, defendant replied he had alcohol at his house.  He drove B. to his second residence on 14th Street, where defendant drank alcohol and they both used cocaine.  They also talked "about a lot of stuff."

15

Defendant went into the bathroom, and when he came out, B., who was supposed to be ready for sex, was standing next to his jacket which was hanging on the barstool. She looked "stunned," as if he had "caught her in the act." Because defendant could tell his jacket had been moved, he checked the jacket pocket which contained his watch and a "Jesus peace chain." Although his chain was still in the pocket, the watch was not. As B. moved swiftly to leave, defendant told her to " 'Hold on' " so he could check her purse for his watch. B. refused to let him look in her purse, stating, " 'I ain't got nothing.' " Though they did not engage in sex, at this point, defendant was naked. They started arguing about defendant's demand to look into her purse, and B. ran to the back balcony and screamed. Defendant told her to " 'Get in here,' " grabbed her, and pulled her back into the apartment. A tussle ensued as defendant attempted to open B.'s purse to retrieve his watch. During the tussle, B. bit defendant's hand, and he responded by hitting her in the mouth and "probably" choking her. Defendant found his watch in her purse and put it back in his jacket pocket.

Soon thereafter, the police arrived and started banging on the door. Defendant was in a "frenzy" because there was cocaine and blood "everywhere," and he was naked. He gave B. a paper towel to cover her mouth and rinsed his bleeding hand. Naked, defendant opened the door. The officers arrested him.[5]

## D.  *Relevant Procedural History*

In a third amended felony information filed October 25, 2019, defendant was charged with kidnapping Jane Doe in violation of Penal Code[6]

---

[5] Defendant called as witnesses a paramedic and two Oakland police officers who testified about Jane Doe's prior inconsistent statements.

[6] All further statutory references are to the Penal Code.

section 207, subdivision (a) (count one) and forcible rape of Jane Doe in violation of section 261, subdivision (a)(2) (count two). As to count two, it was alleged defendant kidnapped the victim within the meaning of section 667.61, subdivision (d)(2).

On November 8, 2019, a jury found defendant guilty on both counts and found the section 667.61 allegation to be true.

On January 17, 2020, the trial court sentenced defendant to a total of 25 years to life in state prison.

## II.

## DISCUSSION

### A. *Failure To Instruct on CALCRIM No. 358 Was Harmless*

#### 1. *Background*

In the process of going over jury instructions, defense counsel asked the court to give CALCRIM No. 358 in its entirety. The standard version of that instruction states: "You have heard evidence that the defendant made [an] [oral] [and] [a] [written] statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

Relying on the instruction's bench notes, which gave a hypothetical example of an interview with an "Officer Smith," the prosecutor asked that the second, cautionary paragraph be stricken because it applies "[g]enerally for purposes of law enforcement statements, which is not the case here";

17

rather, defendant made statements to his victims. The court thought the prosecutor had a point. Curiously, defense counsel agreed with the court as to the statements defendant made to Jane Doe and B. Doe, but still argued this cautionary instruction should be given based on defendant's statements to M. Doe. Defense counsel did not address the statements defendant made to Whitney Doe. The court concluded it would delete the cautionary paragraph; however, it told defense counsel he could argue to the jury that any statement defendant made to M. should be viewed with caution. When the court instructed the jury, it gave CALCRIM No. 358, but omitted the cautionary instruction.[7]

Defendant asserts the trial court committed reversible error in failing to give the cautionary instruction within CALCRIM No. 358, as to statements made by defendant tending to show his guilt, in violation of his Fourteenth Amendment right to due process. The Attorney General concedes the trial court erred by refusing to give the jury the cautionary instruction but maintains that error was harmless because, among other reasons, defendant denied making the statements and the court gave the jury the witness credibility instruction.

### 2. *Analysis*

We begin by examining whether defendant made any statements to Jane Doe, M. Doe, B. Doe, and/or Whitney Doe tending to show he used fear or duress to keep Jane Doe in the van and have sexual intercourse without her consent. In that regard, a number of defendant's statements were used

---

[7] The Attorney General concedes this issue is not forfeited on appeal because although defense counsel acquiesced to the trial court's refusal to give the cautionary instruction as to defendant's statements to Jane Doe and B. Doe, he ultimately did not fully withdraw his request for the cautionary instruction or fully acquiesce to the trial court's ruling.

by the prosecution to prove defendant's guilt, i.e., that he used fear and duress to sexually assault Jane Doe and to transport her in his van.

Defendant told Jane Doe, for example, that he knew about " 'pregnant pussy' " after he had thrown money at her, said " 'Yes,' " when Jane asked him if she was a "hostage," told her to " '[g]et back in the van' " after he allowed her to urinate outside the van, and said " 'No' " when she asked him four times to take her back to the church. As to M. Doe, when she attempted to leave defendant's residence, defendant said, " 'Bitch, you're not going nowhere. Get back in the room,' " made her take her clothes off, stating in a "forceful tone," " 'Take that shit back off,' " and threatened to punch her in the face, while putting his right fist in the palm of his left hand. When B. Doe and defendant were in his apartment, defendant stated she was not going anywhere before he hit her in the mouth, told her to take her pants off, and, while pressing his thumbs on each side of her neck, said, " 'I told you be quiet. Don't make no noise.' " Finally, with respect to Whitney Doe, after defendant made lewd comments and faces, he rolled down the driver's side window and told her he wanted to "fuck [her]" and "fuck whitey."

These statements demonstrate defendant's lack of respect for women and his intent to scare and force them into having nonconsensual sexual intercourse. Importantly, they also confirm that Jane Doe did not consent to having sexual intercourse with defendant or willingly ride in the van. Because defendant's statements were used to prove his culpability, the court's failure to give the cautionary instruction was error.

As explained in *People v. Diaz* (2015) 60 Cal.4th 1176, 1187 (*Diaz),* "[T]he cautionary instruction applies to any extrajudicial oral statement by the defendant that is used by the prosecution to prove the defendant's guilt— it does not matter whether the statement was made before, during, or after

19

the crime, whether it can be described as a confession or admission, or whether it is a verbal act that constitutes part of the crime or the criminal act itself." Because, here, there is no dispute that the court should have given the cautionary instruction included in CALCRIM No. 358 after defense counsel requested it be given, we consider only whether the omission was harmless.

"In determining whether the failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' [Citations.] ' "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admission were repeated accurately. [Citations.]' " [Citation.] [Our Supreme Court] has held to be harmless the erroneous omission of the cautionary language when, in the absence of such conflict, a defendant simply denies that he made the statements. [Citation.] Further, when the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution." (*People v. McKinnon* (2011) 52 Cal.4th 610, 679–680 (*McKinnon*).)

Here, the omission of the cautionary instruction included in CALCRIM No. 358 was harmless.[8] First, as to most of the statements, defendant did not

---

[8] We reject defendant's argument that we should evaluate prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. "Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States

testify one way or another as to their content but took the stand and simply denied having committed the offenses and testified his interactions with the prosecution witnesses were consensual and devoid of threats. Given defendant's denials and the uncontradicted testimony about most of his statements, the primary issue the jury had to resolve was whether the prosecution witnesses were credible or whether they fabricated their testimony. (*People v. Wilson* (2008) 43 Cal.4th 1, 19–20, abrogated on other grounds as stated in *Johnson, supra,* 6 Cal.5th at p. 587.)

Second, the court gave the jury CALCRIM No. 226 (Witnesses), which extensively covered the jury's role in evaluating a witness's testimony, including a variety of factors bearing on the truth or accuracy of that testimony. Those factors included a witness's bias, interest or other motive; prior consistent or inconsistent statements; ability to remember the matter in question; and admissions of untruthfulness. When a jury is thoroughly instructed on the numerous factors involved in assessing witness credibility, failure to give the cautionary instruction in CALCRIM No. 358 is harmless because the jury has been adequately warned to view the witnesses' testimony with caution. (*Diaz, supra,* 60 Cal.4th at p. 1196; *McKinnon, supra,* 52 Cal.4th at p. 680; *People v. Salazar* (2016) 63 Cal.4th 214, 251; *Dickey, supra,* 35 Cal.4th at p. 906.)[9] The error is particularly harmless

---

Constitution. (*Estelle v. McGuire* (1991) 502 U.S. 62, 71–75.)" (*People v. Dickey* (2005) 35 Cal.4th 884, 905 (*Dickey*); accord, *Diaz, supra,* 60 Cal.4th at p. 1195; *People v. Johnson* (2018) 6 Cal.5th 541, 588 (*Johnson*); *People v. Xiong* (2020) 54 Cal.App.5th 1046, 1081.)

[9] Defendant argues that instructing the jury with CALCRIM No. 226 did not render the failure to give the cautionary instruction harmless, but he is mistaken. The only case on which defendant relies, *People v. Lopez* (2005) 129 Cal.App.4th 1508, is inapposite. In *Lopez,* the court concluded the defendant was prejudiced by the jury being allowed to consider his invocation of his right to silence as one of two adoptive admissions, which error was

where the witnesses attributing the statements to defendant are themselves extensively impeached. (*Salazar,* at p. 251; *Dickey,* at pp. 906–907.) Here, Jane Doe, M. Doe, B. Doe, and Whitney Doe were all extensively cross-examined and impeached.

In view of defendant's denials, the absence of testimony by defendant about many of the statements, and the detailed guidance of CALCRIM No. 226, it is not reasonably probable a result more favorable to defendant would have occurred had the jury been instructed with CALCRIM No. 358.

Defendant raises additional claims. He complains that because this was a close case, the trial court's failure to give the cautionary instruction requires reversal as there is a reasonable probability the outcome of the trial would have been more favorable to him had the instruction been given. He argues there were obvious problems with the prosecution's conflicting evidence and that his version of the incident made more sense. True, the prosecution's evidence was not without discrepancies.[10] However, the jury was aware of these discrepancies and was instructed on how to evaluate such testimony,[11] and presumably credited the testimony of the prosecution witnesses after assessing and weighing the prosecution and defense evidence.

---

"compounded" by the failure to give cautionary instructions about evaluating the credibility of witnesses. (*Id*. at p. 1530.) *Lopez* does not assist defendant here.

[10] Jane Doe, for instance, was impeached with her prior inconsistent statements.

[11] As we discuss further below, the jury was instructed about evaluating conflicting evidence, single witness testimony, prior statements, and witness credibility in general. (See, e.g., *Johnson, supra,* 6 Cal.5th at pp. 588–589 [failure to give cautionary instruction was harmless error where jury was otherwise instructed about need to carefully consider conflicting evidence of defendant's statements]; *People v. Smith* (2018) 4 Cal.5th 1134,

In the same vein, defendant contends the jury's actions during deliberation further demonstrate this was a close case because the jury asked for readback of testimony pertaining to whether drugs were in Jane Doe's system and requested to view the video of Jane Doe speaking with the "detective." Defendant also contends that in the prior trial, in which CALCRIM No. 358 was given, the jury was deadlocked for two days until the trial court erroneously excused a juror.

While readback of testimony and a jury deadlock in a prior trial are factors to consider in assessing whether a case is a close call for the jury (*People v. Diaz* (2014) 227 Cal.App.4th 362, 384–385), here, the jury arrived at its verdicts in slightly over five hours (10:35 a.m. to 3:45 p.m.). Considering the jury sat through a one-week trial that included 27 witnesses and extensive medical, GPS, and photographic evidence, the jury's five-hour deliberation (which presumably included a lunch break) was relatively short in duration. We further observe that in the prior trial, after the court excused one juror and substituted in an alternate, the jury reached verdicts, suggesting that prior to the removal of the juror, the jury was most likely hung 11 to one in favor of conviction. In our view, an 11-to-one jury deadlock in favor of conviction is not a close case. (*People v. Christensen* (2014) 229 Cal.App.4th 781, 799 [a 10-to-two jury deadlock in favor of conviction is not a close case].)

Defendant also argues that instructing the jury with CALCRIM No. 1190 and the prosecutor's emphasis on defendant's statements to Jane Doe, M. Doe, B. Doe, and Whitney Doe during closing argument compounded the prejudice created by the court's failure to give the cautionary instruction.

1172 [rejecting defense argument that inconsistent testimony by prosecution witnesses was prejudicial].)

23

CALCRIM No. 1190 (Other Evidence Not Required to Support Testimony in Sex Offense Case) provides, "Conviction of a sexual assault crime may be based on the testimony of the complaining witness alone." Although the jury was instructed defendant's rape conviction could be proven by Jane Doe's testimony alone, defendant complains the jury was not instructed that her testimony and the testimony of the other witnesses about defendant's incriminating statements must be viewed with caution. According to defendant, "This was a vulnerability in the instructions that the prosecutor seized upon" in closing argument.

Defendant's argument is unavailing because in addition to CALCRIM No. 1190, the court also gave the jury CALCRIM No. 301 (Single Witness's Testimony), instructing, "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The jury was further instructed with CALCRIM No. 302 that, "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe." The jury was told not to "accept the testimony of the greater number of witnesses," and "What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point." Moreover, the jury was instructed with CALCRIM No. 226, which provides, "You may believe all, part, or none of any witness's testimony." Finally, the jury was instructed with CALCRIM No. 318 on prior statements, which instructs the jury it may use prior statements "To evaluate whether the witness's testimony in court is believable." Because the court gave these four instructions, we find the jury was thoroughly instructed on how to evaluate the testimony of one witness, whether Jane Doe or defendant. The jury was also instructed the prosecutor's argument was not evidence. As a result,

24

defendant's contention that giving CALCRIM No. 1190 and the prosecutor's closing argument increased the prejudice of erroneously refusing to give a cautionary instruction regarding defendant's oral statements is without merit.

Next, defendant maintains that in "reality" Jane Doe's testimony was "essentially" the only evidence demonstrating she did not consent to having sexual intercourse with him or willingly stayed in the van with him, and "[i]t would be hard to imagine a conviction in this case if, due to the cautionary instruction, any one juror had a reasonable doubt." On the contrary, other evidence corroborated Jane Doe's testimony. Significantly, the jury heard evidence defendant sexually assaulted M. Doe and B. Doe, and exposed himself to Whitney Doe. The jury also heard testimony that the sexual assault examination of Jane Doe revealed redness, swelling, and tenderness on her labia minora, abrasions, and a fresh, nearly two-millimeter tear at the lower opening of her vagina. The examiner testified Jane Doe's injuries were "significant" and specifically said, "More often than not, I do not see injuries this severe in sexual assault cases." Jane Doe also made fresh complaints to A.M. and T.M., indicating she had been raped.[12] In other words, the jury heard abundant other evidence substantiating Jane Doe's testimony.[13]

---

[12] The jury was instructed it could consider the fresh complaints only as to whether and when they were made and the circumstances under which they were made, and could not consider them for the truth of the matter asserted.

[13] In his opening brief, defendant argued that to the extent this court concludes defense counsel forfeited his claim of instructional error or the error was invited, counsel provided ineffective assistance. In his reply brief, defendant concedes the issue would be moot if we accepted the Attorney General's concession there was no forfeiture or invited error. Because we have addressed the claim on the merits, we will not address defendant's argument regarding ineffective assistance of counsel.

### B. Corrections to Probation Record

Defendant contends his trial counsel was ineffective for failing to request corrections to the probation report. The Attorney General concedes, and we agree, that several aspects of the probation report need to be corrected.

#### 1. The Prior Trial

During the prior trial, the prosecutor informed the court that the listing of defendant's 2014 convictions in the probation report was incorrect because all of defendant's convictions were actually for false imprisonment in violation of section 236. After striking the incorrectly listed convictions from the probation report, and in pronouncing judgment, the court noted defendant had four convictions for false imprisonment.

#### 2. The Present Trial

In the instant trial, the court found as a circumstance of aggravation that defendant had served a prior prison term for rape. Defense counsel corrected the court, explaining that although defendant was charged with rape in the prior case, he was only convicted of false imprisonment. The prosecutor agreed with defense counsel that the prior jury did not convict defendant of rape. Thereafter, the court corrected its finding, reciting defendant had been to prison for false imprisonment rather than rape.[14]

The probation report, however, listed one 2014 conviction under section 236 and listed four 2014 convictions for sex crimes, including two convictions for rape. The probation report also contained defendant's Static-

_____

[14] The prosecutor alleged in the third amended information that defendant had four prior section 236 convictions for false imprisonment and noted these same convictions in her motions in limine. During a pretrial hearing, the prosecutor also noted the four prior section 236 convictions involved the Evidence Code section 1108 victims.

99R risk assessment, which defendant claims needs to be "recalculated" without the prior conviction "errors." Defendant maintains, and the Attorney General agrees, the matter must be remanded to the trial court for a hearing to correct the errors in the probation report. We agree.

Because the simple remedy is to remand the matter to the trial court for a hearing to correct any inaccuracies in the probation report and to determine whether the Static-99R risk assessment requires recalculation, we need not decide whether counsel's actions were deficient.

## III.

## DISPOSITION

Accordingly, the matter is remanded for the limited purpose of permitting the trial court to correct any inaccuracies in the probation report and to determine if the Static-99R risk assessment requires recalculation. In all other respects, the judgment is affirmed.

MARGULIES, J.


WE CONCUR:


HUMES, P. J.



BANKE, J.




A159493
*People v. Bratcher*